UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

WESTERN SECTION
CIVIL ACTION
NO.:

|  |  |
|---|---|
| KEVIN BALENO and PATRICIA SCUTARI,<br>　　　　　Plaintiffs<br><br>v.<br><br>OFFICER CHARLES RICKO,<br>CHIEF EDWARD CHASE,<br>and the TOWN OF WENDELL,<br>　　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

COMPLAINT AND DEMAND

FOR A JURY TRIAL

## I.　INTRODUCTION

1.　　In this civil action, plaintiff Kevin Baleno accuses defendant Charles Ricko of violating his Fourth and Fourteen Amendment rights to be free of unreasonable searches and equal protection under the law by conducting two body searches without reasonable suspicion or probable cause. Plaintiff Scutari accuses defendant Edward Chase of violating her First Amendment rights to free speech by retaliating against her for her and her family's criticism of the Wendell Police Department.

## II.　PARTIES

2.　　Plaintiff KEVIN BALENO, at all times relevant to the allegations of this Complaint, was a resident of the Town of Wendell, Franklin County, in the Commonwealth of Massachusetts.

3.　　Plaintiff PATRICIA SCUTARI, at all times relevant to the allegations of this

1

Complaint, was a resident of the Town of Wendell, Franklin County, in the Commonwealth of Massachusetts.

4.      Defendant CHARLES RICKO, at all times relevant to the allegations of this Complaint, was acting under color of law as a Police Officer for the defendant Town of Wendell.

5.      Defendant EDWARD CHASE, at all times relevant to the allegations of this Complaint, was acting under color of law as Chief of Police for the defendant Town of Wendell.

6.      Defendant TOWN OF WENDELL is a municipality, incorporated in the Commonwealth of Massachusetts.

## III.    FACTS

7.      During March of 2001, Wendell residents, who opposed hiring a full-time officer for the Wendell Police Department, placed a petition expressing their views in the Wendell Country Store, owned by plaintiff Scutari. On two different occasions, part-time Wendell Police Officer Charles Ricko, who would be hired for the position of a full-time officer if one was created, came into the store and signed the petition. The first time he signed with his correct name, then drew a happy face beside it. The next time he signed "George Bush" and gave as his address, the White House.

8.      In addition to these two occasions, defendant Ricko had been in the store numerous times and had numerous conversations with plaintiff Scutari, whom he recognized on sight.

9.      At approximately 8:30 P.M. on the evening of April 14, 2001, plaintiff Baleno, who had earlier in the evening borrowed chains from a friend to aid in pulling another friend's truck out of the mud, was in the parking lot of the Wendell Country Store, owned by his mother, plaintiff Scutari. Plaintiff Baleno was engaged in transferring the chains from his truck into the trunk of the

2

owner of the chains, when he noticed defendant Ricko pull into the parking lot and stare at his pickup truck.

10.     Defendant Ricko parked across the lot from plaintiff Baleno's pickup and watched as he unloaded the chains. Plaintiff Baleno then got into his truck and pulled out of the parking lot, heading north on Lockes Village Road towards his home, two miles away, where he lives with his parents and three siblings.

11.     As plaintiff Baleno pulled out of the parking lot, defendant Ricko followed him for approximately a half a mile, and then began flashing his lights. Plaintiff Baleno immediately pulled over, stopping next to the bandstand in the center of Wendell.

12.     Thinking that defendant Ricko had stopped him because his truck had recently failed inspection,[1] plaintiff Baleno reached into the glove compartment and retrieved the inspection papers from the motor vehicle department validating that he was still within the sixty-day grace period allowed by the state to bring his truck up to the standards necessary to pass inspection.

13.     Defendant Ricko took the inspection papers, advised plaintiff Baleno that he had stopped him because he had a taillight out, and asked him to produce his license and registration.

14.     He then asked plaintiff Baleno why he had been reaching into the glove compartment, and if he had any drugs, alcohol, or weapons in the car.

15.     Plaintiff Baleno replied that he had no drugs, alcohol, or weapons in the car, but when he went to produce his license and registration, he realized that he had inadvertently left his wallet containing his license and registration in his mudded pants when he had returned to his house to change his clothes after pulling his friend out of the mud.

---

[1]The truck's inspection sticker indicated that it had failed to pass inspection.

3

16.    Plaintiff Baleno explained the reason that he could not produce his license and registration to defendant Ricko, and told him who he was and where he lived.[2] He further advised defendant Ricko that he had reached into the glove compartment to retrieve the inspection papers, which he had handed to defendant Ricko.

17.    Defendant Ricko turned to plaintiff Baleno's passenger and asked him who he was. Plaintiff Baleno's passenger identified himself as Jody Levangie, a local teenage resident of Wendell. Defendant Ricko acknowledged that he recognized Mr. Levangie.

18.    Defendant Ricko then turned back to plaintiff Baleno and demanded that he produce alternative identification. When plaintiff Baleno again stated that all his identification was in his wallet in his pants pocket back at his home, defendant Ricko returned to his cruiser, taking plaintiff Baleno's inspection papers with him.

19.    Plaintiff Baleno assumed that during the time that defendant Ricko was in the cruiser, he entered plaintiff Baleno's license and registration numbers, taken from the inspection papers, into the police computer data files and verified that there were no outstanding warrants against him.

20.    When defendant Ricko returned to plaintiff Baleno's truck, he began to question plaintiff Baleno about who his parents were and where he lived. Defendant Ricko acted as if he did not believe plaintiff Baleno, even though he should have recognized plaintiff Baleno as he had been introduced to him on two previous occasions.

21.    Without asking plaintiff Baleno's permission, defendant Ricko then opened the door of the truck on the driver's side and shined his flashlight all over the interior of the truck.

---

[2]Plaintiff Baleno lives less than two miles from where defendant Ricko had stopped him.

4

22.     After examining the interior of the truck defendant Ricko again turned to Mr. Levangie and ordered him to get out of the truck. He began to question him, asking him to verify plaintiff Baleno's description of the previous events in the evening. Plaintiff Baleno had the impression that defendant Ricko was questioning Mr. Levangie to see if his story matched that of plaintiff Baleno.

23.     Defendant Ricko then asked Mr. Levangie if he had any weapons or drugs. Mr. Levangie denied having any drugs, but advised defendant Ricko that he had a Swiss army knife in his pocket. Defendant Ricko did not pat Mr. Levangie down, but allowed him to return to the passenger seat in the car.

24.     Defendant Ricko then walked back to the driver's side of the truck and ordered plaintiff Baleno to get out of the truck. He then performed a Terry-type frisk of plaintiff Baleno, finding neither drugs nor weapons. Defendant Ricko rudely remarked to plaintiff Baleno that because of his hat, he thought he was some kind of gang member.[3]

25.     Defendant Ricko then allowed plaintiff Baleno to return to his seat in the truck. As plaintiff Baleno opened the door to his pickup, defendant Ricko, acting as if he had just noticed that plaintiff Baleno's inspection sticker showed that the truck had failed inspection, ordered him to produce the inspection papers.

26.     Plaintiff Baleno, who was unnerved by defendant Ricko's actions, began to search around the interior of the truck, even though he knew that defendant Ricko had not returned the papers to him. As plaintiff Baleno searched, defendant Ricko once again shined his flashlight into the truck.

---

[3]Because it was a chilly night, plaintiff Baleno was wearing a plain black ski cap.

5

27.    As plaintiff Baleno was looking through the glove compartment, defendant Ricko suddenly said, "Oh, wait a minute, I have it," and pulled the folded up inspection papers out of his pocket. He then returned to his cruiser and wrote out a citation for plaintiff Baleno's failure to have his license and registration.

28.    The citation given to plaintiff Baleno stated that Defendant Ricko had not searched his motor vehicle.

29.    Plaintiff Baleno returned to his home, visibly shaken by this experience. When he told his parents what defendant Ricko had done to him, they became very upset and called the station to find out from defendant Ricko why he had treated their son the way he had.

30.    Instead of giving plaintiff Baleno's parents a rational explanation for his behavior, defendant Ricko first told them that if they were upset they could file a complaint or start another petition. He then advised them that he found it necessary to frisk plaintiff Baleno and search his truck for weapons because: (1) he did not recognize plaintiff Baleno; (2) he believed that plaintiff Baleno's behavior in the parking lot was suspicious; and (3) plaintiff Baleno was wearing a ski cap which could have been an indication that he was a gang member.

31.    Defendant Ricko further advised plaintiff Baleno's parents that he felt justified in taking the precautions he had because drivers who do not produce their license and registration frequently have warrants out against them.

32.    Both Federal and Massachusetts State Laws prohibit police officers from conducting a search of persons or vehicles during routine traffic stops unless (1) the officer can articulate a reasonable suspicion that the operator or passenger is armed and dangerous or (2) the officer has probable cause to suspect that a vehicle stopped on a public road contains contraband or

6

other evidence of a crime.[4]

33.     Defendant Ricko had neither a reasonable suspicion that plaintiff Baleno was armed and dangerous nor probable cause to suspect that his truck contained contraband when he stopped him for a faulty taillight. The excuses he made to plaintiff Baleno's parents for searching plaintiff Baleno's truck and conducting a Terry-frisk of plaintiff Baleno were clearly pretextual.

34.     Plaintiff Baleno was, at the time of the stop, a slight, youthful-looking, eighteen year old male who has no criminal record of any sort. Until April 14, 2001, he had never even been pulled over for a minor traffic violation.[5]

35.     Defendant Ricko either recognized or should have recognized plaintiff Baleno, who is one of the more visible town residents. Wendell Country Store, owned and operated by his mother, is a gathering point for the nine hundred residents of Wendell. Plaintiff Baleno frequents his mother's store almost every day, coming after school and meeting with his friends at the outside picnic tables during the warm months of the year.

36.     Defendant Ricko, who has been on the Wendell Police Department for three years, has been in plaintiff Baleno's mother's store many times. He knows plaintiff Baleno's parents by sight and has had frequent conversations with them.

37.     On several occasions prior to the April 14 incident, defendant Ricko had been introduced to plaintiff Baleno. On the most recent occasion, plaintiff Baleno went over to

---

[4]Since plaintiff Baleno was not arrested nor was his vehicle towed, defendant Ricko had no justification to conduct a search incidental to arrest or an inventory search of a towed vehicle, the only two other legal justifications for a warrantless search during a traffic stop.

[5]Shortly before the incident on April 14, plaintiff Baleno had been stopped by an Orange Police Officer who noticed his rejected inspection sticker. When plaintiff Baleno produced his inspection papers showing he was still in the sixty-day grace period, the Orange Officer waved him on his way.

7

defendant Ricko, who was questioning his friends' reasons for sitting at the picnic tables outside the store after it had closed, and re-introduced himself, reminding defendant Ricko that he was the son of the owner of the store. He then advised defendant Ricko that his friends were at the store waiting for him. Therefore, defendant Ricko's contention that he did not recognize plaintiff Baleno is not convincing, especially when he first encountered him in the parking lot of his mother's store.

38.    Moreover, when defendant Ricko "ran" plaintiff Baleno's license and registration numbers, he had access to plaintiff Baleno's name and address, plus a physical description of plaintiff Baleno. At the same time, he could have verified that there were no outstanding warrants against plaintiff Baleno. Therefore, defendant Ricko's claim that he had to search plaintiff Baleno's truck and frisk him for weapons because he did not know who he was, and that he suspected that plaintiff Baleno's inability to produce his license and registration indicated that there might be outstanding warrants for his arrest, were not valid.

39.    The other excuses given by defendant Ricko are equally invalid. If he had truly believed that plaintiff Baleno's behavior in the parking lot of the store was "suspicious" (plaintiff Baleno was transferring chains from his truck to the trunk of his friend's car), he could have approached plaintiff Baleno in the parking lot and asked him what he was doing. Furthermore, wearing a ski cap, even if it was an indication that plaintiff Baleno was a gang member (which it was not), is not a sufficient reason to search plaintiff Baleno's truck or to pat him down.

40.    If defendant Ricko truly believed that he was in danger from plaintiff Baleno, the principal justification for conducting a Terry-frisk, he would have ordered him out of the car and searched him immediately. A reasonable officer who had a legitimate fear for his personal safety would have not allowed a potentially violent driver to remain in his vehicle without first checking

8

him and his vehicle for weapons. That defendant Ricko allowed plaintiff Baleno to remain in his truck while he returned to his cruiser to check out plaintiff Baleno's identification revealed that his real motivation for the search and frisk was a "fishing" expedition forbidden by the Fourth Amendment to the Constitution.

41.    Therefore, when defendant Ricko opened the door of plaintiff Baleno's truck without permission, searched plaintiff Baleno's truck, and conducted a Terry-frisk of plaintiff Baleno, he violated plaintiff Baleno's Fourth Amendment rights to be free from unreasonable searches and seizures.

42.    One week after the first incident, on April 21, 2001, at approximately 10:00 P.M., plaintiff Baleno, whose truck was in the shop getting the repairs necessary to pass inspection, was driven home from his job at the Super Stop and Shop in Greenfield by a teenage friend, Jesse Davis, in Mr. Davis' car.

43.    Plaintiff Baleno was dressed in his Super Stop and Shop uniform. Mr. Davis, who works as a host in a Greenfield restaurant, was wearing a suit and tie.

44.    Mr. Davis was driving down Wendell Depot Road north of Lake Grove School when he was pulled over by defendant Ricko who claimed that Mr. Davis was going 82 M.P.H. in a 40 M.P.H. zone. Mr. Davis immediately took responsibility for his reckless behavior.

45.    Defendant Ricko requested Mr. Davis to blow at his face, then, detecting no odor of alcohol on Mr. Davis' breath, requested and received Mr. Davis' license and registration.

46.    Defendant Ricko then asked Mr. Davis if there were any drugs, alcohol or weapons in the car. Mr. Davis replied that there were none. At that point defendant Ricko reached out and opened Mr. Davis' door without permission, a violation of Mr. Davis' Fourth Amendment rights.

47.    Defendant Ricko then began to shine his flashlight all around the interior of the car.

9

In so doing he noticed a cooler on the back seat. Defendant Ricko then ordered Mr. Davis out of the car and asked him what was in the cooler. Mr. Davis replied that there were some drinks in it.

48.    Upon hearing Mr. Davis' reply, defendant Ricko ordered him to open the cooler which contained bottles of beer and small "nips" of alcohol, left over from a party held a couple of days ago.

49.    Defendant Ricko then ordered Mr. Davis to open the trunk of the car. When Mr. Davis complied, defendant Ricko shined his light inside. In so doing he noticed an old, beat-up T-ball bat in the truck. Defendant Ricko then asked, Mr. Davis, "What are you some kind of ball-player?

50.    Mr. Davis replied that "no, not really." He explained that "its (the bat) been there for a long time—since last summer—friends of mine left it in the car after playing ball." "Defendant Ricko sarcastically asked Mr. Davis, "you expect me to believe that?" Mr. Davis told defendant Ricko that he should believe him because what he had said was true.

51.    As Mr. Davis returned to the car, defendant Ricko advised him that he was going to call his parents. He returned to the cruiser and apparently called Mr. Davis' mother.

52.    Defendant Ricko then returned to the car, approaching it on the passenger side, and requested plaintiff Baleno by name to step out of the car. Defendant Ricko then conducted a full body search of plaintiff Baleno. Instead of patting him down, defendant Ricko ran his hands all over plaintiff Baleno's body, including jamming his hands into and behind plaintiff Baleno's genitals and running his hand up between plaintiff Baleno's buttock cheeks. He took plaintiff Baleno's hat off his head and felt around inside it. Finding nothing, defendant Ricko, ordered plaintiff Baleno to get back in the car.

53.    When Mr. Davis' mother arrived, defendant Ricko ordered Mr. Davis to get out of

10

the car and pour the alcohol out onto the side of the road.

54.     As Mr. Davis began to comply with this order, defendant Ricko ordered plaintiff Baleno to get out of the car and help him. Plaintiff Baleno, who had not even known that there was alcohol in the car, did not feel that it was his responsibility to help get rid of it. When he asked defendant Ricko why he was expected to pour out the alcohol, defendant Ricko snarled at him, "Because I told you to."

55.     After all the alcohol had been emptied on the ground, defendant Ricko ordered Mr. Davis and plaintiff Baleno to place the empty cans in the cooler and to put the cooler back in the car. Mr. Davis and plaintiff Baleno refused, knowing that if Mr. Davis was stopped again, he could be charged with driving with open containers. Mr. Davis' mother agreed to take the empty cans with her.

56.     Defendant Ricko then issued a $395.00 speeding ticket to Mr. Davis and allowed him and plaintiff Baleno to continue home. On the citation issued to Mr. Davis, defendant Ricko stated that he had not searched the car.

57.     Pursuant to both federal and Massachusetts State law, a police officer may conduct a body search of a passenger of a vehicle stopped along a public way for a routine traffic violation if she has probable cause to believe that the vehicle contains contraband or other evidence of a crime. In this case, the only crime for which defendant Ricko had probable cause was that of an underage operator transporting alcohol, a misdemeanor. Therefore, he could legally conduct a full body search of plaintiff Baleno only if he had probable cause to believe that plaintiff Baleno was concealing bottles of alcohol on his person, an obvious absurdity.

58.     Defendant Ricko did not even have the reasonable articulateable suspicion of personal danger necessary to conduct a Terry-frisk of plaintiff Baleno (or Mr. Davis).

11

59.    Note that defendant Ricko did not conduct a full body search of Mr. Davis, the operator of the car. Therefore, his decision to conduct a full body search of plaintiff Baleno clearly violated plaintiff Baleno's Fourth Amendment rights to be free from unreasonable searches and seizures.

60.    Defendant Ricko's decision to conduct a full body search of plaintiff Baleno, but not of Mr. Davis, violated plaintiff Baleno's Fourteenth Amendment right to equal protection under the law.

61.    Defendant Ricko's sole motivation in subjecting plaintiff Baleno to an illegal full body search was to embarrass and humiliate him.

62.    The First Amendment to the Constitution guarantees citizens the right to criticize the government and the right to petition the government for redress of grievances without fear of retaliation. That defendant Ricko subjected plaintiff Baleno to this degrading experience of a full body search one week after plaintiff Baleno's parents complained about his treatment of their son, and shortly after plaintiff Baleno's mother had allowed residents to circulate a petition in her store opposing a full time police officer in Wendell (a position that defendant Ricko expected to fill), argues that defendant Ricko subjected plaintiff Baleno to an illegal search in retaliation for his parents' complaints and/or for their support of the petition. Therefore, defendant Ricko's illegal body search of plaintiff Baleno violated his and his mother's First Amendment rights to free speech and their rights to petition the government without fear of retaliation.

63.    At least seven other complaints have been filed against defendant Ricko by Wendell citizens in the last year. All but one of these complaints describe incidents in which defendant Ricko subjected Wendell young people to unnecessarily rude and offensive interrogation. Five of the complaints allege that defendant Ricko subjected the young people to illegal searches of their person

12

and vehicle. The sixth alleged that defendant Ricko subjected three preteens to an offensive interrogation, blinding them with his flashlight, when they approached him to ask him where they could find a public telephone. In no instance did defendant Ricko have probable cause to arrest the people involved or specific and articulateable facts that would have led him to believe that they were armed and dangerous. Therefore, defendant Ricko has demonstrated a pattern of abuse of young Wendell residents which violates their Fourth Amendment right to be free from unreasonable searches and seizures and their Fourteenth Amendment right to equal protection under the law.

64.     As a result of defendant Ricko's negligent, reckless and/or intentional acts, including, but not limited to, illegal search and seizure, unlawful retaliation for criticizing and petitioning the government, and assault and battery, plaintiff Baleno suffered severe embarrassment and humiliation as well as the loss of his Constitutional rights. He continues to restrict his activities for fear that he will be subjected to more humiliating retaliation by defendant Ricko.

65.     On Monday, June 14, 2001, plaintiff Scutari was alerted by her security service that the alarm at her store, the Wendell Country Store, had been activated. She immediately drove to the store, thinking that a new employee had inadvertently set off the alarm. When she arrived at the store at approximately 6:20 A.M., no one was there. After waiting for approximately twenty minutes and noting that there was no evidence of a break-in, plaintiff Scutari assumed that one of the sensors had malfunctioned. She entered the building, deactivated the alarm, and located the problem sensor.

66.     Normally, as soon as the alarm is activated, the security company providing the service notifies both plaintiff Scutari and the Shelburne Falls Dispatch which, in turn, notifies the Wendell Police Officer on call. If the Officer on call is unavailable to respond, Dispatch then notifies the State Police who respond when no one is on duty in Wendell.

67.    On June 14, 2001, no one had responded when plaintiff Scutari arrived at the store.

68.    Neither defendant Chase nor the State Police came to the store at any time to investigate the cause of the activation of the alarm.

69.    Neither defendant Chase nor the State Police phoned plaintiff Scutari to find out if everything was all right.

70.    Plaintiff Scutari, concerned that the security company had failed to alert Dispatch, called the Shelburne Falls Dispatch to ask if they had received notification of the alarm. Dispatch advised plaintiff Scutari that the security company had notified them and that they had then notified defendant Chase who had taken the call. However, defendant Chase neither came to the store to investigate the problem nor called plaintiff Scutari to check out if she was all right.

71.    The alarm in the store had been activated several times in the past couple of years. Some of the incidents resulted from problems with one of the sensors. However, the store had been broken into several months before. On all the previous occasions that the alarm had been activated, either defendant Chase or the State Police had responded.

72.    Plaintiff Scutari believes that defendant Chase's failure to respond to the activation of the alarm in the store was in retaliation for her and her husband's criticism of the Wendell Police Department and for their support of the petition opposing a full-time officer in Wendell.

73.    Retaliation for criticizing the Police Department violates plaintiff Scutari's First Amendment Rights to free speech. Retaliation for circulating a petition violates her First Amendment Rights to petition the government. Therefore, defendant Chase's failure to respond to her alarm violated Plaintiff Scutari's First Amendment rights guaranteed by the Constitution of the United States.

74.    As a result of defendant Chase's negligent, reckless and/or intentional acts under

14

color of law, including, but not limited to retaliation for asserting her right to free speech and her

right to petition the government plaintiff Scutari suffered the loss of her Constitutional rights.

75.    Plaintiff Scutari continues to fear that her store will receive no protection in the

future and/or the members of the Wendell Police Department will effect other methods of retaliation.

76.    In addition to the civil rights violations and multiple reckless and/or intentional torts

described above, the deprivation of plaintiff Baleno's and plaintiff Scutari's rights was directly and

proximately caused by the negligent failure of Chief of Police Edward Chase and the Town of

Wendell to adequately screen, test, train, supervise, investigate and discipline its officers, to the

extent that custom and practice and acquiescence by supervisory officials resulted in an

unconstitutional policy.  Further, as a result of these unconstitutional and negligent acts, plaintiff

Baleno and plaintiff Scutari suffered damages.

77.    On or about June 18, 2001, the plaintiffs sent to the defendants an Official Demand

Letter pursuant to M.G.L. Chapter 248, § 4.  As of the date of filing this Complaint, the defendants

have not responded.


IV.    **CAUSES OF ACTIONS**

*COUNT ONE*
*VIOLATIONS OF PLAINTIFF BALENO'S FOURTH AND FOURTEENTH AMENDMENT*
*RIGHTS*

78.    The plaintiffs hereby incorporate by reference the allegations of Paragraphs 1

through 77 of this Complaint as though fully set forth herein.

79.    Defendant Ricko conducted two unconstitutional searches of plaintiff Baleno, the first

on the evening of April 14, 2001 and the second on the evening of April 21, 2001.

80.    Defendant Ricko had neither reasonable suspicion nor probable cause to believe that

15

plaintiff Baleno possessed either a dangerous weapon or contraband on the respective evenings referred to in paragraph 78. Based on the totality of the situation on April 14, 2001, no reasonable police officer would have searched plaintiff Baleno's car without his consent, or conducted a pat-down of plaintiff Baleno. Based on the totality of the situation on April 21, 2001, no reasonable police officer would have subjected plaintiff Baleno to a full body search. Therefore, defendant Ricko's search of plaintiff Baleno's car on April 14, 2001, his pat-down of plaintiff Baleno on the same evening, and his full body search of plaintiff Baleno on April 21, 2001 violate plaintiff Baleno's Fourth Amendment rights to be free from unreasonable searches.

81.    Moreover, because defendant Ricko did not subject, Mr. Levangie, plaintiff Baleno's passenger on the evening of April 14, 2001, to a pat-down, or Mr. Davis, the operator and owner of the car he stopped on the evening of April 21, 2001, to a full-body search, he violated plaintiff Baleno's Fourteenth Amendment rights to equal protection under the law.

82.    The defendant's conduct, as described above, was under color of state law.

83.    The defendant's conduct constitutes the requisite "intimidation, threat, or coercion" protected against under the Massachusetts Civil Rights Act.

84.    As a direct and proximate result of these intentional and/or reckless acts of defendant Ricko, plaintiff Baleno suffered severe and extreme emotional distress and mental anguish including, but not limited to, public humiliation, fear of police, stress, anxiety, and sleep disturbances. In addition, he suffered the lost of his Constitutional rights. Plaintiff Baleno is thereby entitled to damages and relief pursuant to 42 U.S.C. §§ 1983 and 1988, and M.G.L. Chapter 12, §§ 11H and 11I.

16

## COUNT TWO
### ASSAULT AND BATTERY AGAINST DEFENDANNT RICKO

85.    The plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through 84 of this Complaint as though fully set forth herein.

86.    The actions of defendant Ricko put plaintiff Baleno in apprehension of an unwanted, intentional touching and, in fact, defendant Ricko intentionally subjected plaintiff Baleno to two illegal body searches, even though he had no probable cause to suspect him of a crime, or reasonable suspicion that he was armed or dangerous.

87.    As a direct and proximate result of defendant Ricko's unwanted, intentional touching, plaintiff Baleno suffered severe and extreme emotional distress and mental anguish including, but not limited to, public humiliation, fear of police, stress, anxiety, and sleep disturbances.  Plaintiff Baleno is thereby entitled to damages and relief pursuant to the Massachusetts common law against assault and battery.

## COUNT THREE
### VIOLATION OF FIRST AMENDMENT RIGHTS

88.    The plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through 87 of this Complaint as though fully set forth herein.

89.    Defendant Ricko's unreasonable full body search of plaintiff Baleno on the evening of April 21, 2001, in retaliation for plaintiff Baleno's and his parents' criticism of defendant Ricko's unconstitutional search of plaintiff Baleno on the evening of April 14, 2001 violated plaintiff Baleno's First Amendment rights of free speech.

90.    Defendant Chase's shirking of his duty to investigate the activation of the alarm in plaintiff Scutari's store on June 14, 2001 in retaliation for her and plaintiff Baleno's criticism of the

Wendell Police Department is a violation of her First Amendment rights to free speech.

91.    The defendants' conduct, as described above, was under color of state law.

92.    The defendants' conduct constitutes the requisite Aintimidation, threat, or coercion@

protected against under the Massachusetts Civil Rights Act.

93.    As a direct and proximate result of the defendants' conduct, the plaintiffs suffered

severe and extreme emotional distress and mental anguish including, but not limited to, stress,

anxiety, and sleep disturbances. In addition, they suffered the loss of their Constitutional right to

free speech. The plaintiffs are thereby entitled to damages and relief is pursuant to 42 U.S.C. §§

1983 and 1988, and M.G.L. Chapter 12, §§11H and 11I.

**COUNT FOUR**
***NEGLIGENT TRAINING, SUPERVISION, AND DISCIPLINE***

94.    The plaintiffs hereby incorporate by reference the allegations of Paragraphs 1

through 93 of this Complaint as though fully set forth herein.

95.    Defendant Chase, pursuant to an unconstitutional custom or policy, has failed to

adequately train, supervise, investigate, control, and/or discipline defendant Ricko. This deliberate

indifference has been negligent, amounting to deliberate indifference to the rights of citizens.

96.    With the knowledge of and under the direction of defendant Chase, defendant Ricko,

acting under color of law, has engaged in a pattern of conduct which was the moving force that

caused the violations of the plaintiffs' constitutional rights. Defendant Chase, pursuant to an

unconstitutional custom or policy, has failed to adequately hire, train, supervise, control, investigate,

and/or discipline defendant Ricko, who has denied the plaintiffs their rights guaranteed by the First,

Fourth and Fourteenth Amendments to the United States Constitution, as well as the Massachusetts

18

Constitution.

97.    Defendant Chase has been negligent and deliberately indifferent in the training of Wendell Police Officers. Defendant Chase, as the Police Chief of the Wendell Police Department, has failed to provide minimally acceptable standards of training or instruction to the Wendell Police Department in contemporary and up-to-date law enforcement standards, policies and procedures, the laws of search and seizure, the laws governing probable cause to prosecute, constitutional rights of citizens, and civil liability of police officers.

98.    The official policy, custom and/or usage of the Wendell Police Department under the command of defendant Chase is unconstitutional, insofar as it dictates, encourages and/or permits Wendell Police Officers to violate the civil rights of citizens.

99.    The official policy, custom and/or usage of the Wendell Police Department under the command of defendant Chase violates the Constitution of the United States and of the Commonwealth of Massachusetts, and caused the violations of the constitutional and civil rights of the plaintiffs as alleged in this Complaint.

100.    The plaintiffs are thereby entitled to damages and relief pursuant to 42 U.S.C.§§ 1983 and 1988, and M.G.L. Chapter 12, §§ 11H and 11I.

### COUNT FIVE
### NEGLIGENCE/MASSACHUSETTS TORT CLAIM
### M.G.L. CHAPTER 258 § 4

101.    The plaintiffs hereby incorporate by reference the allegations of Paragraphs 1 through 100 of this Complaint as though fully set forth herein.

102.    The defendant Town of Wendell and/or agents and employees of the Town of Wendell were negligent and, therefore, are liable to the plaintiffs for damages pursuant to M.G.L. Chapter 258, § 4.

19

**WHEREFORE,** plaintiffs Kevin Baleno and Patricia Scutari, pray that this court enter judgment for the plaintiffs and:

1. award appropriate compensatory damages to the plaintiffs in an amount to be determined by the court;

1. award punitive damages to the plaintiffs in an amount to be determined by the court;

2. award the plaintiffs costs, interest and attorneys' fees; and

3. award such other relief as this court deems just, equitable and appropriate.


THE PLAINTIFFS HEREBY DEMAND A JURY TRIAL.


DATED: February 18, 2004

Respectfully submitted,
Kevin Baleno
Patricia Scutari
The Plaintiffs
By Their Attorney


Caroline Carrithers
17 South Street
Ashfield, Massachusetts 01330
413 628-4058
BBO# 643247